UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARA GRAHAM,

        Plaintiff,

                                  File No: 1:10-cv-719

v.

                                  HON. ROBERT HOLMES BELL

ACCESS BUSINESS GROUP, LLC,

        Defendant.

_____/

## O P I N I O N

This matter is before the Court on Defendant's Motion for Summary Judgment. (Dkt. No. 55, Mot.; Dkt. No. 56, Br.)  Plaintiff filed a Response (Dkt. No. 59) and Defendant filed a Reply (Dkt. No. 69).  For the reasons below, Defendant's motion will be granted.

### I. Introduction and Background

Defendant terminated Plaintiff's employment on April 6, 2010, and Plaintiff alleges that Defendant did so wrongfully.  She alleges, variously, that she was terminated in retaliation for her taking medical leave in 2009 - 2010, in retaliation for a 2007 Workers' Compensation claim, in retaliation for requests for accommodation of a disability which began in 1997,[1] and as a result of discrimination against her because of a disability. Defendant asserts that it fired her for showing a pornographic video, on company time, to

_____

[1]According to a later deposition, this date should be 2007.  (Br. Ex., Graham Dep. 131:1-10.)

coworkers on a cellular phone in a work area in which cell phones are prohibited and then lying about it.

**A.)    Plaintiff's Employment History**

Plaintiff began working for Defendant in March of 1999, and beginning in 2000, she worked in Defendant's cosmetics plant as a skid loader.[2]  (Dkt. No. 2, Am. Compl. ¶¶ 6-7; Br. 2.)  Apparently, the plant employed a "zone" concept for assignments, and Plaintiff was assigned to Line 2 of the plant.  (Resp. 4.)  In that capacity, Plaintiff was responsible for making sure the production line did not run out of components (to ensure continuous production and prevent stoppages on the line) and to lift the boxes of completed product off the line and onto pallets.  (Resp. 4; Br. 2; Resp. Ex. 1, Graham Dep. 27:21-28:9, 39:10-20.)

Until 2006, Defendant reports Plaintiff's job performance was "average."  (Br. 2.)  Beginning in 2006, however, her annual reviews begin to go downhill, reflecting an increasing concern about her ability to produce the quantity and quality of work expected.  Her 2006 review informed her that,

> You need to improve the quantity of work you produce based on the work standards for your position.  During this review period Setups and Crew Leaders indicated that you had a tendency to wander off of your line.  At times this caused a line to shut down briefly if components ran out . . . .

(Br. Ex., Graham Dep. Ex. 7, page 3 of 6.)  The same is reflected in her 2007 review.  (*Id.*

---

[2]In this context, the term "skid loader" apparently refers to the title of an occupation which requires a great deal of lifting and moving heavy components, rather than to the eponymous machine with the same function.

Ex. 8, page 4 of 7 ("Feedback from the crewleaders, as well as my own observations, is that Sara frequently leaves her line to talk to others.  She must realize that we need her full attention on the line to ensure we meet our quality standards.").)  In 2008, her rating in this area had slipped from 2.00 ("Performs Below Job Expectations/Needs Improvement") to 1.00 ("Performs Unsatisfactorily"), with the following comments:

> Your time management skills are unsatisfactory.  You fail to complete assigned tasks within the allotted time.  When required, you are unable to manage multiple tasks.  During this review period Sara has received a verbal and a written warning for her poor time management skills.  Sara must use downtime more efficiently to ensure that the lines run efficiently.  I have witnessed several different occasions where Sara has been on a line that is slow or down and she would spend all of her extra time talking to others in the area instead of completing the tasks that need to be caught up and completed. Sara has also called in vacation day on numerous occasions.  Please try to schedule your time off as far in advance as possible to ensure that we have adequate coverage on the lines.

(*Id.* Ex. 11, pages 3-4 of 6.)  By 2009, Plaintiff's annual review ended with the comment, "Sara needs to improve her job performance very soon.  Almost every month there is an issue to be addressed with her.  Her future as an employee depends upon this sustained, improved work performance."  (*Id.* Ex.16, page 4 of 5.)

## B.)   Plaintiff's Medical History

As noted above, Plaintiff argues that she was fired because of a medical condition. According to Plaintiff, she first raised complaints about her shoulders and back in April of 2007, when she brought the matter up with her family physician.  (Resp 4; Resp. Ex. 2, Dr. Johnson Note.)  She brought it to the attention of her employer, Defendant, on August 22,

2007, in a Medical Problem Report.  (Resp. 4; Resp. Ex. 3, 08/27/07 Report.)  In that

Report, Plaintiff reported pain behind her left shoulder blade which began when she was

loading bottles into a bottlesorter while working overtime one Friday that April.  (*Id.*)

During this time period, she received two medical passes from her employer:[3]  one with the

restriction "no lifting over 25 lbs, no work over 18 inches from body. See Doctor tomorrow

[morning]" and the other with the restriction "no repetitive bending or twisting, no lifting

> 10#."  (Resp. Exs. 5, 6.)[4]  From August 27, 2007, to September 4, 2007, Plaintiff was

assigned to "Business Relations Training" as part of Defendant's Transitional Work

Program.  (Resp. Ex. 8.)  When Plaintiff returned to her family physician on August 28,

2007, she was diagnosed with a thoracic/scapular strain, (Resp. Ex. 7), and on August 31,

2007, she visited Dr. Shelley Drew in Defendant's medical department.  (Resp. 5.)  The

doctor's notes from that visit end with the note, "We will see [Plaintiff] back as needed."

---

[3]Three entities appear to play roles in employing Plaintiff: Defendant, "Alticor," and "Amway."  Defendant Access Group reports in its corporate disclosure statement that its parent corporation is "Alticor Corporate Enterprises Inc.," its grandparent is "Alticor Investments Inc.," its great-grandparent is "Alticor Enterprises Inc.," and its great-great-grandparent is "Alticor Inc." (Dkt. No. 4.)  The original complaint filed in this case asserts that Alticor Enterprises Inc. does business as Amway Global.  (Dkt. No. 1.)  Both parties seem willing to concede, however, that at least at this stage, the knowledge and actions of one of these entities can be imputed to the others.  The Court will maintain the parties' practice of not drawing a distinction.  To the extent that it clarifies things in this instance, however, the medical passes referred to here are each entitled "Alticor Medical Pass." (Resp. Exs. 5, 6.)

[4]The second of these (Resp. Ex. 6) is dated 8/23/07.  The first (Resp. Ex. 5) is dated 8/21/07, the day before Plaintiff's Medical Problem Report, but Plaintiff refers to this as the "8/22/07 Medical Pass."  (Resp. 4.)

4

(Resp. Ex. 9.)  That was Plaintiff's last contact with Defendant's medical department until March 24, 2009.  (*Id.*; Resp. 5.)

On March 24, 2009, Plaintiff filled out a second Medical Problem Report in which she complained of "back pain behind left shoulder blade."  (Resp. Ex. 11.)  She was put on restriction – "no over shoulder lifting, work with left arm elbow at side" (Resp. Ex. 12) – which was continued by Dr. Drew the following week, (Resp. Ex. 9).  Defendant assigned Plaintiff, again under the Transitional Work Program, to the Spaulding Service Center on April 6, 2009.[5]  (Resp. Ex. 13.)  On April 4, 2009, Dr. Drew saw Plaintiff again and continued her restriction of keeping her left elbow at her side and no lifting with her left arm.  (Resp. Ex. 9.)  There was no change at the May 1, 2009, appointment with Dr. Drew. (*Id.*)  By May 15, 2009, however, the doctor reported that, "[Plaintiff] states that she feels good today.  She has been release[d] from PT by Jill. . . .  No further follow-up scheduled as patient's symptoms have been resolved."  (*Id.*)  Her only other contact with Defendant's medical department in 2009 was to report a mosquito bite.  (*Id.*)

In January, 2010, Plaintiff informed Lisa Hammer, Defendant's Environmental Health and Safety Coordinator, of a complaint she had about overhead lifting.  (Resp. Ex. 19, Hammer Dep. 5:4-6.)  Hammer then conducted an Ergonomic Evaluation wherein she concluded that:

---

[5]As discussed below, Plaintiff's attendance record in the days following April 6, 2009, is at issue in this case.

> Based on the information I obtained and observing employees placing boxes on the shelf I do agree that this activity presents an ergonomic risk due to the overhead, excessive reaching. The weight of the box along with the overhead reaching can definitely contribute to repetitive motion injuries of the shoulder, neck and back.

(Resp. Ex. 21, Cosmetics Ergonomic Evaluation.)   According to Plaintiff, after her investigation, Hammer told Plaintiff that "[s]omething needs to change. Either you need off this line or we're going to possibly get a lift in here." (Resp. Ex. 1, Graham Dep. 120:5-8.)

Another outcome of Plaintiff's exchange with Hammer is recounted in the following email from Jim Brundidge, one of Plaintiff's supervisors to Bill Dunn, a disability specialist:

> Bill, Sara was telling Lisa she is experiencing pain when doing certain skid loader activities in the plant. Can we have her set up for a fitness for work test. I believe Bernie [Howard, another of her supervisors] was sending her over to medical to check out her condition today.

(Resp. Ex. 22, Brundidge Email.)   In a followup email, Dunn responded:

> I will check with the medical receptionist, and make sure Sara's appointment is re-scheduled. I will then try to speak with Dr. Drew that same day, after she sees Sara, and discuss whether Sara is able to perform all aspects of her job. I'll get back with you after this. Also, I spoke with Sara late last week. I explained, as tactfully as I could, that if she was unable to perform all essential functions of her job, that she could lose her job. She responded well to this, indicating that she did not want this to happen. She admitted she has difficulty reaching upward, but said she will try to find ways to do this safely.

(Resp. Ex. 28, Dunn Email.)

As a result, Plaintiff made another visit to Dr. Drew on February 5, 2010 for "recurrence of pain." (Resp. Ex. 9.) "She state[d] that the problem with these lines is she has to reach up over her head to push boxes [and] that this causes her muscles in her upper

back to hurt." (*Id.*)  Dr. Drew sent her to physical therapy "to try to improve posture and increase strength in the upper back." (*Id.*)

On March 19, 2010, Plaintiff came in for followup with Dr. Drew. (*Id.*)  "She state[d] that she [was] not better [and that] she especially notice[d] pain on lines 2 and 4." (*Id.*)  The final note in Dr. Drew's log, dated April 13, 2010, states that:

> It was brought to my attention that Sara, who was last seen on 3/19/10 and was supposed to f/u in 2 weeks, failed to show for her most recent appointment on 4/9/10, and has not called to reschedule.  Also noted is that the patient no-showed for 3 of her 4 scheduled PT appointments per the note from her therapist dated 4/8/10.  Therefore, I assume the patient is resolved, and restrictions are lifted.  No further treatment.

(*Id.*)  As it turns out, Plaintiff had been fired on April 6, 2010.

**C.)    The Pornographic Video and Plaintiff's Termination**

In the same month, March of 2010, Plaintiff made a complaint against a coworker named Mark Rosenberger, concerned that he was rude and would not help her out.  (Resp. 10; Resp. Ex. 36.)  The third shift supervisor, Bernie Howard, investigated the complaint. In the course of his investigation, two things were revealed: that Rosenberger was thoroughly unimpressed with Plaintiff's work performance ("[Rosenberger] said the line ran well whenever she wasn't on it, and as soon as she showed up she just couldn't keep up.") and that, according to Rosenberger, "a few weeks prior . . . they were working together and she called him back to her work area and showed [him] a video on her cell phone of a naked woman sitting on a ping pong table shooting ping-pong balls out of her vagina into a cup." (Resp. Ex. 36.)   Although Plaintiff's poor work performance was, as revealed by her

performance reviews, neither pleasing nor surprising to her supervisor, the display of a pornographic video was both displeasing and surprising.  Defendant does not allow employees to carry cell phones on the production floor, and displaying pornography violates Defendant's policy against harassment and its standards of conduct for its employees.  (Br. Ex., Morton Dep. 53-54; Br. Ex. Morgan Decl. Attach C, "Summary of Findings Report.") A new investigation began immediately.

Initially, this investigation was also conducted by Howard.  According to Rosenberger, when he was running Line 2, Plaintiff asked him if he wanted to see a video or if he would be offended.  (Resp. Ex. 37.)  He agreed to watch it, thinking it would be a video of Plaintiff's children, and it was, in fact, the pornographic video described above.[6] (*Id.*)  Rosenberger also stated that another employee, Loc Huynh, may have been shown the video.  (Br. Ex., Howard Dep. 24:8-12.)  Howard then spoke to Huynh, who confirmed that Plaintiff had shown him the video, and to Plaintiff, who acknowledged that she had the video on her cell phone but denied having shown it to either man.  (*Id.* at 24:8-25:5; Resp. Ex. 37.)  At this point, Howard contacted Human Resources and recommended that the matter be investigated.  (Br. 7.)

---

[6]There appears to be some confusion about whether the naked woman was sitting on a pool table or a ping-pong table.  (*Compare* Resp. Ex. 37, Rosenberger Interview *with* Resp. Ex. 37, Huynh Interview.)  Although Plaintiff makes much of this confusion, (*see* Resp. 23), the Court notes that the pornographic video was short (less than ten seconds), on a small screen, and likely of poor quality.  The table was not likely to have been the feature which most captured the viewer's attention, and the Court does not find that the confusion has any bearing on Rosenberger's or Huynh's credibility.

The matter was taken up by Tim Morton, the human resources consultant for the cosmetics plant. (*Id.*) Morton first met with Howard, who described the results of his brief investigation. (Resp. Ex. 36 Page ID#754-55.) Morton then spoke with Rosenberger, who related much the same information he had to Howard: that approximately three weeks before, Plaintiff had called him off the line and shown him the video; that she said she received it from a former coworker; that he had thought about reporting the incident then and had decided not to, but brought it up when Howard had asked him "if there was anything else going on between the two of them that he [Howard] needed to know about"; and that Plaintiff may have shown the video to Huynh. (*Id.* at Page ID#755.) Morton then spoke with Plaintiff. She revealed that she had received the video from a former coworker and that she had, on a weekend while not at work, sent it on to current coworkers, including Kim Basillo (whom Morton would interview later).[7] (*Id.*) She denied, however, showing it to coworkers, or even having her cell phone, in the work area. (*Id.*) She stated that Rosenberger was being increasingly rude to her and that he was just trying to get her in trouble. (*Id.*) Her theory is that he overheard her discussing the video and made up the story that she had shown it to him. Morton next spoke with Huynh. Huynh stated that he had been working on the line several weeks before and that Plaintiff had called him over and told him she had a video she wanted him to see, which turned out to be the same video

---

[7]Apparently, receiving pornographic videos on her cell phone and forwarding them on to others was not unusual for Plaintiff, who acknowledges having more pornographic videos on her phone than she can remember. (Br. Ex., Graham Dep. 91:1-25.)

described by both Rosenberger and Plaintiff.  (*Id.*)  Huynh reported that he could not see the video very well, but that he told Plaintiff, with whom he reported getting along pretty well, that the video was "pretty nasty" and that he had walked away.  (*Id.*)  Finally, Morton spoke with Basillo.  She told Morton that she had "heard through the grape vine" that Rosenberger had told Howard that Plaintiff was showing videos on her cell phone at work.  (*Id.*)  She confirmed that Plaintiff had sent her the video, but said that she was not aware of Plaintiff showing the video to anyone at work and that she had never seen Plaintiff with her phone in the work area.  (*Id.*)

On the basis of this investigation, Morton recommended that Plaintiff be terminated. Although he was not confident of Rosenberger's credibility, Morton found Huynh to be "exceptionally credible," and concluded that he was telling the truth.  (Br. Ex., Morton Dep. 52:1-12 ("[I]t's one of those where you sit, have a conversation with somebody, it was exceptionally credible. . . .  Mannerism, mode of speaking and based on how he got along with everybody, had no issues, had no conflict that I was aware of.  Very credible.")  Thus, Defendant concluded that Plaintiff had shown a pornographic video to at least two other employees in the work area during work time.  (Res. Ex. 36 at ABG000043.)  This was found to be a "violation of company rules, including the Policy Against Harassment and the Standards of Conduct."  (Br. Ex., Morton Decl. ¶ 8.)  Accordingly, Morton stated his conclusions in an email to his manager:

- Termination of Employment is recommended based on the following:
  - the unsolicited sharing of a graphic and inappropriate cell phone

10

video on company time and in the workplace on at least two instances to two separate employees
- the dishonesty of the employee accused of sharing content of the video
- the accused employee's recent and well documented history of corrective actions to include a Final Written warning – followed by a separate Written warning for behavior
- two consecutive years of less than acceptable performance reviews
- This conduct is a violation of Amway's
  - Policy Against Harassment
  - Standards of Conduct
- Shift, Plant and Department leadership firmly supports the recommendation for termination
- Based on the investigation, review of work history and past practice, termination is supported by myself and Danielle Bahrie [another Human Resources representative]
- A coaching should also be given to Mark Rosenberger regarding his failure to report this incident immediately (given his initial response to the inappropriate the [sic] content of the video).

(Resp. Ex. 44, Termination Approval Emails, PageID#781-82.) Plaintiff's employment was terminated on April 6, 2010.  (Resp. 12.)

**D.)    Litigation**

Plaintiff filed her amended complaint against Defendant in this Court on August 12, 2010.  She included three counts.  In the first, she alleges that Defendant retaliated against her for exercising her rights under the Family and Medical Leave Act by terminating her. (Am. Compl. ¶¶ 23-30.)   In the second count, she alleges that she is disabled and/or perceived to be disabled within the meaning of Michigan's Persons with Disabilities Civil Rights Act and that Defendant discriminated against her because of her disability and retaliated against her for requesting accommodations.  (*Id.* at ¶¶ 31-42.)  In the third count,

11

she alleges that Defendant retaliated against her for filing a worker's compensation claim. (*Id.* at ¶¶ 43-48.)  Although Plaintiff does not note it in her Amended Complaint, she correctly notes in her response that the claim in the third count is properly brought under Michigan's Worker's Disability Compensation Act.  (Resp. 20.)  Defendant moves for summary judgment on each of the three claims.

## II. Discussion

It is undisputed that Plaintiff does not have direct evidence of the discrimination and retaliation she alleges, and both parties have correctly briefed the *McDonnell-Douglas* burden-shifting analysis, which applies to claims under each of the three relevant statutes.  (Br. 8-18; Resp. 12-24.); *see Skrjanc v. Great Lakes Power Service, Co.*, 272 F.3d 309, 315 (6th Cir. 2001) (FMLA); *Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 437 n.26 (Mich. Ct. App. 2002) (PWDCRA); *Dortman v. ACO Hardware, Inc.*, 405 F. Supp. 2d 812, 822 (E.D. Mich. 2005) (WDCA).  Under the *McDonnell-Douglas* analysis, in order to survive summary judgment, Plaintiff must first make out a prima facie case under the relevant statute, then (if Defendant articulates a legitimate, non-discriminatory/non-retaliatory reason for its actions) she must demonstrate that Defendant's stated reasons are pretext.

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the Court must look beyond the pleadings and

assess the proof, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), construing the evidence and drawing all reasonable inferences in favor of the nonmoving party, *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*; *see generally*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

**A.)   Retaliation under the Family and Medical Leave Act**

Plaintiff's first claim is that Defendant terminated her in retaliation for exercising her rights under the Family and Medical Leave Act (FMLA). (Am. Compl. ¶ 24.)  The FMLA provides that eligible employees may take up to twelve weeks of leave during any twelve month period "because of [a] serious health condition that makes an employee unable to perform the functions of the position of such employee," and prohibits an employer from retaliating against an employee for taking such FMLA leave.  29 U.S.C. § 2615(a).  The employer cannot "'use the taking of FMLA leave as a negative factor in employment actions.'"  *Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003) (quoting 29 C.F.R. § 825.220(c)).

In order to establish a prima facie claim for impermissible retaliation under the

FMLA, Plaintiff must show that

(1)   she availed herself of a protected right under the FMLA by notifying [Defendant] of her intent to take leave,

(2)   she suffered an adverse employment action, and

(3)   that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action.

*Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006).  Contested here is the third element, the "causal connection" or "causal link" between the FMLA activity and the adverse employment action.  "The 'causal link'. . . is demonstrated by showing that the employer would not have taken the adverse action 'but for' the employee's protected activity." *Agee v. Northwest Airlines, Inc.*, 151 F. Supp. 2d 890, 896 ( E.D. Mich. 2001); *see also Allen v. Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999) ("In order to show a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action.").  The burden is on Plaintiff to show the causal connection, but the burden "is not intended to be an onerous one." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 315 (6th Cir. 2001).

To support her claim that a causal connection exists between FMLA leave and her termination, Plaintiff suggests that she "may establish causation through temporal proximity between the increased frequency of the days she took leave and the date of termination." (Resp. 15.)  Indeed, although Plaintiff had been requesting and receiving FMLA leave since 2002, the rate had increased somewhat in the last two months of her employment to

14

approximately one day per week.  (Resp. 25.)  Various of Plaintiff's coworkers and supervisors undoubtedly knew about this leave.

Defendant argues, contrarily, that "[t]emporal proximity alone cannot establish causation as a matter of law of logic."  As a matter of logic, Defendant is undoubtedly correct – *post hoc ergo propter hoc* is rejected as a logical fallacy.  At law, however, the question is not whether temporal proximity necessarily implies causation, but rather whether temporal proximity can be indirect evidence sufficient to permit an inference of causation. The Sixth Circuit Court of Appeals has decided that in some cases, proximity alone can be sufficient to satisfy the causation element.  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  This, however, is not such a case.

It has been recognized in both this circuit and others that cases in which temporal proximity alone may suffice to show a causal connection are rare.  *Id.* (citing *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002) ("[M]ere temporal proximity between the filing of the charge of discrimination and the action alleged to have been taken in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue.")); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001) (stating that "[u]nless there is very close temporal proximity between the protected activity and the retaliatory conduct, the plaintiff must offer additional evidence to establish causation," and noting that a prior case "held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation"); *Cardenas v.*

*Massey*, 269 F.3d 251, 264 (3d Cir. 2001) ("[T]emporal proximity alone will be insufficient to establish the necessary causal connection when the temporal relationship is not unusually suggestive.").)  In this circuit,

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality. . . . The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

*Id.*  Here, Defendant did not immediately retaliate against Plaintiff after leaning about her protected activity.[8]  Plaintiff's supervisors had known about her protected activity for years and about its increasing frequency for months.  There is no evidence that the human resources professionals who made the decision to fire her knew about the FMLA activity at all.  (*See* Resp. Ex. 44, Termination Approval Emails.)  As such, this is not a case in which temporal proximity between protected activity and adverse action can satisfy the causation element.  Plaintiff "must couple temporal proximity with other evidence of retaliatory

---

[8]Rather, Defendant moved with deliberate speed to remove Plaintiff after learning (or after coming to reasonably believe) that she had violated company rules.

conduct to establish causality."  *Id.*

Plaintiff suggests that Defendant may have wanted to fire her because her FMLA leave was disruptive to the production process, and draws the Court's attention to one of her supervisor's general statement that production is sometimes shut down because someone has failed to show up for their shift.  (Resp. 15; Resp. Ex. 33, Brundidge Dep. 36:2-4.)  This does not advance Plaintiff's causation argument.  The absence of valuable employees is inevitably disruptive to employers' operations.  The FMLA was adopted to ensure that employees can take permissible leave regardless of the disruption it causes, not to ensure that no disruption occurs.  Moreover, it does not follow from her supervisor's statement that Plaintiff's absences were disruptive.  Rosenberger, at least, believed that the line functioned more smoothly when Plaintiff was not there.  (Resp. Ex. 36.)

Plaintiff also asserts that she was disciplined for taking FMLA leave, and that that discipline became a consideration when Defendant fired her.[9]  Plaintiff specifically refers to four days – April 6-9, 2009 – in which she was marked absent.  (Resp. 13; Resp. Ex. 14, Timecard.)  As a result of these absences, along with four others which Plaintiff does not dispute, Plaintiff received two written warnings.  (Resp. Ex. 45.)  The latter of these two warnings was included as one of five notations under Plaintiff's "Corrective Action History"

---

[9]For the first time in her response, Plaintiff attempts to raise a claim of interference under the FMLA, arguing that Defendant failed to provide her with here entitlements under the FMLA.  (Resp. 12-14.)  This claim is untimely, and the Court rejects it accordingly. However, even if the claim were timely, it would fall prey to the same weaknesses inherent in Plaintiff's retaliation claim.

in Morton's written report of his investigation into the incident involving the pornographic video.[10] (Resp. Ex. 36.)   Thus, Plaintiff argues, these absences became one of the considerations in Defendant's decision to terminate her.  Moreover, Plaintiff asserts that she was eligible during this period for FMLA leave for both her children and herself on an intermittent basis.  (Resp. 13.)  Defendant argues that these absences were not eligible for FMLA leave because Plaintiff failed to provide documentation from her physician justifying the leave despite its request.  (Reply 5.)

Plaintiff offers nothing other than her bare assertions to establish that she was entitled to FMLA leave for the disputed absences.  As Plaintiff carries the burden of establishing a prima facie case of retaliation under *McDonnell-Douglas*, this failing is fatal to Plaintiff's claim.   Furthermore, even if Plaintiff's unsupported assertions are accepted as true, Plaintiff's retaliation claim still fails because Plaintiff cannot show that Defendant's stated reason for terminating Plaintiff – its belief that Plaintiff showed a pornographic video in the workplace – is a pretext for retaliation.

There are three methods by which Plaintiff may demonstrate pretext by rebutting a Defendant's legitimate, nondiscriminatory reason for termination: (1) the employer's stated reason has no basis in fact, (2) the reason offered was not the actual reason for the

---

[10]The other four notations, all accrued since October of 2008, were "Written Warning - workplace disruption/spreading rumors," "Final Written Warning - Job Performance," "Written Warning - Job Performance," and "Verbal Warning - Job Performance."  (Resp. Ex. 36.)

termination, or (3) the reason offered was insufficient to explain the employer's action. *Clark v. Walgreen Co.*, No. 09-6284, 2011 U.S. App. LEXIS 10596, at *15-17 (6th Cir. May 24, 2011) (relying on *Manzer v. Diamond Shamrock Chems*, 29 F.3d 1078, 1084 (6th Cir. 1994)).  Plaintiff has not created any material issue of fact concerning Defendant's reasonable belief that she showed a pornographic video at work, nor is there any question that the display of pornographic materials at the work place in violation of company policy is a sufficient basis for termination.  This leaves only the second method, which is the most difficult to show.  In this case, Plaintiff cannot meet her burden.  The investigation which culminated in Plaintiff's termination was concerned with the pornographic video, not attendance violations.  Notably, attendance infractions were not mentioned in the email which Morton sent to his manager recommending Plaintiff's termination, (Resp. Ex. 44), and there is no evidence that the manager who approved Plaintiff's termination was even aware of them.  Plaintiff has not presented any evidence by which a reasonable jury could conclude that Defendant did not terminate her employment due to the pornographic video. Thus, even if Plaintiff had presented a valid prima facie case of retaliation, Plaintiff cannot demonstrate that Defendant's proffered reason for terminating her employment was pretextual, and her retaliation claim must fail.

**B.)    Discrimination under Michigan's Persons With Disabilities Civil Rights Act**

Plaintiff also alleges that Defendant violated Michigan's Persons with Disabilities Civil Rights Act (PWDCRA) by terminating her because of an actual or perceived disability,

19

and refusing to accommodate her alleged disability.  However, Plaintiff has failed to make

a prima facie case of discrimination under PWDCRA because she has not established that

she is "disabled" within the meaning of the Act.  *Chiles v. Machine Shop, Inc.*, 238 Mich.

App. 462, 473 (1999).

> The PWDCRA defines disability as:
>
> > (i) A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic: (A) . . . substantially limits one or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits one or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion. . . . (iii) Being regarded as having a determinable physical or mental characteristic described in subparagraph (i).

Mich. Comp. Laws § 37.1103.  Thus, not every impairment rises to the level of disability

under the PWDCRA.  *Chiles*, 238 Mich. App. at 474.  A person has a disability only if she

has a physical or mental characteristic that substantially limits one or more major life activity.

"[I]t is not enough for [a characteristic] to affect a major life activity, but rather the plaintiff

must proffer evidence from which a reasonable inference can be drawn that such an activity

is substantially limited." *Id.* at 479 (internal citations omitted).  Major life activities include

"functions such as caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working." *Stevens v. Inland Waters, Inc.*, 220 Mich. App.

212, 217; 559 N.W.2d 61 (1996).  The requirement that a disability "substantially limits" a

major life activity means that "a disability normally does not include temporary medical

conditions, even if those conditions require extended leaves from work." *Chiles*, 238 Mich. App. at 479-80. "An impairment cannot be 'substantial' if it is merely temporary in nature." *Id.*

Plaintiff has not established any disability within the statutory definition. In her complaint, Plaintiff references her height of five foot two inches (Compl. ¶¶ 15-17) and back pain from an injury sustained in 2007 (Compl. ¶¶ 9-14) as the bases for her PWDCRA claim. But lack of stature that is still within the range or normal human height is not a disability. *See Andrews v. State of Ohio,* 104 F.3d 803, 808 (6th Cir. 1997) ("physical characteristics that are not the result of a physiological disorder are not considered impairments"); *Mehr v. Starwood Hotels & Resorts Worldwide, Inc*., 72 Fed. Appx. 276, 280, 287 (6th Cir. 2003) (affirming district court's decision denying plaintiff's motion to amend to add a claim based on disability discrimination, finding that being short was not a disability under the ADA and thus such amendment was futile). Nor, generally, is temporary back pain. *Jones v. Beacon Harbor Homes, Inc.*, 2011 WL 711144, at *2 (Mich. Ct. App. Mar. 1, 2011) (citing *Chiles*, 238 Mich. App. at 479 n.6, 480).

Furthermore, Plaintiff has not shown that her alleged disabilities substantially limit one or more of her major life activities. In her response, Plaintiff claims that her back pain interfered with her ability to care for her children and her ability to work. (Resp. at 17.) But Plaintiff testified that she could care for her children from 2007-2010. The medical record cited by Plaintiff establishes only that she felt pain in August 2007 when she lifted her

21

child—not that she was unable to adequately care for her children over time. (Resp. Ex. 3, Medical Problem Report, Pg. ID 662.)   As for life activity of working, Plaintiff has not provided evidence that her back pain excludes her from "a class of jobs or a broad range of jobs in various classes."   29 C.F.R. § 1630.2(j)(3)(i).  And, with respect to her actual job, Plaintiff continued to work after her 2007 injury.  From September 2007 through March 2009, Plaintiff worked without making any medical complaints.  Because the disability alleged by Plaintiff does not generally fall within the PWDCRA, is temporary in nature, and has not been shown to substantially limit a major life activity, Plaintiff has failed to establish that she is disabled within the meaning of the statute.   Nor does Plaintiff provide any evidence that Defendant regarded her as disabled within the meaning of the statute. Accordingly, Plaintiff has failed to make a prima facie case of PWDCRA discrimination.

**C.)   Retaliation under Michigan's Workers' Disability Compensation Act**

Michigan's Workers' Disability Compensation Act (WDCA) prohibits retaliation against employees who "filed a complaint or instituted or caused to be instituted a proceeding under this act or because of the exercise by the employee on behalf of himself or herself or others of a right afforded by the act." Mich. Comp. Laws § 418.301(11).  In the third count of her complaint, Plaintiff alleges that she suffered a work related injury in 2007, that she filed a claim for workers' compensation benefits, that Defendant disciplined Plaintiff upon learning of her claim, and that retaliation for her wokers' compensation claim lead to her termination in 2010.  (Am. Compl. ¶¶ 9, 44-48.)

To establish a prima facie case of retaliatory discharge, Plaintiff has "the burden of proving that (1) she was engaged in a protected activity, (2) defendants knew of the protected activity, (3) defendant acted adversely to plaintiff, and (4) the protected activity caused the adverse action." *Lamoria v. Health Care & Retirement Corp.*, 230 Mich. App. 801, 818 (1998), *vacated and reinstated in pertinent part* 233 Mich. App. 560, 593 (1999).

Despite being challenged by Defendant, (Br. at 11), Plaintiff has produced no evidence establishing that she filed a workers' compensation claim in 2007, much less that her termination three years later was caused by a 2007 claim. Instead, Plaintiff's response brief raises additional injuries and workers' compensation claims in 2009-2010, which are not mentioned in Plaintiff's complaint. (Resp. at 21.) However, even considering these newly alleged incidents, Plaintiff fails to make a prima facie case of retaliation under the WDCA.

To survive summary judgment, Plaintiff must show a causal connection between a protected activity under the WDCA and her termination. *Chiles*, 238 Mich. App. at 470. But Plaintiff has not identified any evidence that the individuals who made the decision to terminate her employment were aware that she engaged in any activity protected by the WDCA. This is fatal to Plaintiff's claim. *Garg v. Macomb County Comm. Mental Health Servs.*, 472 Mich. 263, 696 N.W.2d 646 (2005) (Plaintiff must prove "that *defendant knew* that she was engaged in such activity. Absent such a showing, there could be no 'retaliation' on the employer's part . . . .").

Plaintiff claims that Howard and Brundidge were aware "of the work place [sic] injury that [Plaintiff] suffered" and that Plaintiff "complained to the safety department." (Br. at 21.) But under the WDCA, "[a]n employee who at the time of the adverse employment action has done nothing more than provide oral notice to her employer that she believes she was injured on the job has not exercised a right afforded by the WDCA." *Lavigne v. Dow Chem., Inc.*, 09-10146-BC, 2010 WL 1711153 (E.D. Mich. Apr. 28, 2010) (citing *Vettese v. Jacobson Stores, Inc.,* No. 222508, 2001 WL 951742, at * 3 (Mich. App. Ct. Aug. 21, 2001); *Zimmerman v. Comprehensive Health Servs., Inc.,* No. 207280, 1999 WL 33438834 (Mich. Ct. App. Jul. 9, 1999)). Likewise, complaining about purported workplace safety or ergonomic issues is not activity protected by the WDCA. *See generally*, Mich. Comp. Laws § 418.101-.941. Plaintiff has not shown that Howard and Brundidge were aware that she engaged in any conduct protected by the WDCA; thus, Plaintiff has not shown causation, and her WDCA retaliation claim must fail.

## III. Conclusion

For each of Plaintiff's claims (FMLA, PWDCRA, WDCA), Plaintiff carries the burden of making a prima facie case of discrimination or retaliation under *McDonnell-Douglas*. Plaintiff has not met this burden. Furthermore, with respect to Plaintiff's retaliation claims, even if she could make a prima facie case, Plaintiff has not presented evidence which establishes that Defendant's legitimate, nondiscriminatory reason for terminating her employment is pretextual. Accordingly, Defendant's motion for summary

judgment will be granted.  An order consistent with this opinion will be entered.


Date:    August 25, 2011                    /s/ Robert Holmes Bell
                                            ROBERT HOLMES BELL
                                            UNITED STATES DISTRICT JUDGE

25